UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WILLAM G COLDWATE,

    Plaintiff,

v.

ALCATEL-LUCENT USA, INC.,

    Defendant.

No. 10-CV-4918
Judge James B. Zagel

**MEMORANDUM OPINION AND ORDER**

Plaintiff William G. Coldwate ("Coldwate") worked for Defendant Alcatel-Lucent USA, Inc. ("ALU") and a predecessor corporation from September 1981 until his discharge on October 4, 2008. Coldwate claims that his termination by ALU violated the Illinois Human Rights Act, 775ILCS 5/101 *et seq*. ("IHRA"); the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002 *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. Defendant has moved for summary judgment on all counts. For the following reasons, Defendant's motion is granted.

**I. BACKGROUND**

Defendant is a Delaware corporation that specializes in research and innovation in communications technology. Since at least September 1981, it has operated a Product Development Shop ("PDS") in Naperville, Illinois, where parts used by other divisions of the company are constructed. In September 1981, Plaintiff was hired by Defendant to work as Metal Fabricating Mechanic in the Naperville PDS. In this position, Plaintiff fabricated precision sheet

1

metal parts, including brackets, chassis and shelves.  This work necessarily involved the use of at least three machines that required overhead motion.1

Plaintiff had a number of health problems during his 27 years in Defendant's employ, including tearing of his right and left rotator cuffs, ACL reconstruction surgery, and heart surgeries, that required him to take substantial leaves of absence and for which Defendant made numerous accommodations.  This case stems from a rupture to Plaintiff's right rotator cuff that he suffered in an off-duty car accident on May 14, 2006.  The 2006 injury was the second time that Plaintiff had completely ruptured his rotator cuff; in 1995 he suffered his first complete rupture which required surgical reconstruction.

Plaintiff was off work due to his May 14 injury until May 30, 2006, at which time he returned to work with a 10-pound lifting restriction on his right arm.  On June 12, 2006, one of his physicians added a restriction of no repetitive reaching or twisting of his right arm.  Defendant accommodated these restrictions by giving Plaintiff available light-duty work, such as paperwork, basic facility maintenance and furniture inventory.

In late 2006, Plaintiff developed heart problems that required him to take medical leave from October 12, 2006 to February 18, 2007.  When he returned, he was given the same light-duty work as before to comply with his right shoulder restrictions.  Plaintiff's heart problems delayed operation on his rotator cuff, but his cardiologist eventually gave him clearance and on June 20, 2007, Plaintiff underwent reconstructive surgery.  He was on medical leave from work between June 20 and September 18, 2007.

---

1 As Defendant points out in its Reply, Plaintiff's Rule 56.1(b)(3) response to Defendants 56.1(a)(3) statement of facts is seriously flawed.  Plaintiff variably disputes facts in the record without providing evidentiary support, disputes statements while pointing to evidence that in no way controverts (and in some cases actually *corroborates*) Defendant's assertions, or makes frivolous semantic distinctions.  All denials not supported by competent evidence in the record, or unresponsive to the facts asserted, are ineffectual and deemed to be admissions.  Fed. R. Civ. P. 56(e)(2).

Plaintiff returned to work on a restriction of no use of his right arm. Defendant accommodated this by giving him further light-duty work. Plaintiff's surgeon, Dr. Watt, gradually adjusted these restrictions as follows: no lifting over 0.5 pounds (as of October 8, 2007); no lifting or carrying over 1 pound and seated work only (as of November 14, 2007); sit and stand only, walking limited to personal needs, and no lifting over 1 pound with right arm (as of November 21, 2007).

On December 25, 2007, Plaintiff went to the emergency room with pain and was diagnosed with a kidney stone. Soon after this, he experienced back pain, was diagnosed with sciatica, and took another leave of absence. On April 7, 2008, Plaintiff had lower back surgery to repair bulging disc and alleviate the sciatic nerve complications.

Throughout Plaintiff's leave of absence for the sciatic nerve problem, he and Dr. Watt were in contact with Christine Gliori ("Gliori"), an Occupational Nurse employed by Defendant who also served as Plaintiff's Disability Support case Manager. On February 22, 2008, Dr. Watt sent Gliori a letter stating that Plaintiff's shoulder had "been showing gradual, but slow progress," and that his [Dr. Watt's] "prognosis is somewhat guarded because of the nature of the massive tear, which was repaired." (Def. Ex. 12). In May 2008, Gliori received another note from Dr. Watt stating that Plaintiff could "return to work full duty with no restrictions." (Def. Ex. 13). The note provided no further explanation.

On June 4, 2008, Gliori spoke to Plaintiff by phone. Plaintiff told Gliori that he would be asking his back doctor, Dr. McGivney, for release to return to work with no restrictions. That same day, Plaintiff's supervisor, Dave Coleman ("Coleman"), sent an email to Gliori requesting

3

an update on Plaintiff's expected return to work and any anticipated restrictions. The email stated in relevant part:

> Additionally, last year, I requested . . . a Fitness for Duty evaluation for this employee to determine if [he] is able to meet the physical job requirements on a LONG TERM basis. Unfortunately, the employee was absent due to health reasons before this could be performed. As you know, he has [had] significant health issues over the last three (3) years, many requiring surgery and long absences. Can you please let me know where we stand with this process[?] (Def. Ex. 9, Disability Medical Notes at WC207).

Gliori responded to the email by advising Coleman that Plaintiff expected to return to work soon with no restrictions, and that she would defer to Caroline Bergland, the Nurse Manager at ALU and Gliori's supervisor, on the appropriateness of a fitness for duty examination ("FFDE").

Gliori and Bergland also spoke with Coleman on June 4, 2008 regarding Plaintiff's potential return to work. Bergland's notes of the conversation indicate that Coleman asked "for reassurance that [Plaintiff would] be able to sustain attendance at work with no restrictions." (Def. Ex. 9). On June 5, 2008, Bergland again spoke to Coleman about Plaintiff's return to work. Coleman told Bergland that he wanted Plaintiff to undergo a functional capacity evaluation ("FCE") prior to returning to the job for assurance that further limitations would not be needed.

On June 9, 2008, Gliori faxed a letter to Dr. McGivney asking him to order an FCE for Plaintiff to "both provide reassurance and objectively determine [Plaintiff's] ability to sustain the demands of his job." (Def. Ex. 16). Gliori included with her a letter a 2-page "Occupational Requirements" sheet that Coleman had filled out regarding the physical demands of the Metal Fabricating Mechanic position. The sheet stated, among other things, that the job required "reaching above shoulder" between 1-33% of the time.[2]

---
2

4

On June 10, 2008, Plaintiff called Gliori and told her that Dr. McGivney was "not happy" with the FCE request and felt that Gliori was questioning his expertise. Plaintiff told Gliori that Dr. McGivney refused to order the FCE and had cleared Plaintiff to return to work with no restrictions. Plaintiff told Gliori that he had a note from Dr. McGivney to support this. Nevertheless, after discussing the matter further with Bergland, Gliori decided to go forward with the FCE.3

On June 12, 2008, Gliori received a note from Dr. McGivney which stated only, "May return to work June 16. No restrictions." (Def. Ex. 17). Gliori contacted Plaintiff and told him not to return to work until a further review of his restrictions could be conducted. On June 18, 2008, Gliori discussed the matter with Bergland and Dr. George Pearah, who served as Defendant's medical director from 1972 until 1996 and was then serving as a part-time contractor. One of Dr. Pearah's duties was to provide his medical opinion to case managers like Gliori when determining what restrictions, if any, an employee should have upon returning to work.

After discussing Plaintiff's case, Gliori, Bergland, and Dr. Pearah agreed that an FCE was appropriate. Gliori arranged for Plaintiff to undergo the test with a physical therapist at a third-party vendor, WCS Naperville. Gliori provided the physical therapist, Jonathan Erickson, with the Occupational Requirements sheet completed by Coleman. On July 1, 2008, Plaintiff underwent the FCE. Shortly thereafter, Erickson sent a report to Defendant and advised Gliori over the phone that Plaintiff should be restricted from any overhead lifting over 5 pounds with his right arm. The report also recommended that Plaintiff "return to work full duty." However, it

---

3 Gliori testified that she questions about half of the physician releases she receives, depending on her knowledge of the situation and her medical judgment.

appears that Erickson's clearance was based on an erroneous understanding that Plaintiff's job did not require any overhead lifting or overhead activity. (Def. Ex. 9, Disability Medical Notes at WC212; Ex. 21, FCE Report 7-1-08 at D29).4

Gliori then discussed the FCE results with Dr. Pearah, who decided to place two permanent restrictions on Plaintiff based upon the type of surgery Plaintiff received, Plaintiff's history, and his potential for further injury. The two restrictions were that Plaintiff (1) should not lift more than 5 pounds over shoulder level with his right arm, and (2) should not perform work over shoulder level requiring repetitive motion with his right arm. Dr. Pearah made these restrictions permanent because, in his best medical judgment, no amount of possible healing would allow Plaintiff to overcome the restrictions.

Gliori informed Plaintiff and Coleman of the restrictions. Generally, once Defendant's medical staff has determined what restrictions should be placed on an employee, it is up to the employee's supervisor to determine whether they can accommodate the employee's restrictions. On July 10, 2008, Plaintiff called Gliori to request a meeting with Dr. Pearah. Dr. Pearah declined to see Plaintiff because he believed he had all the information he needed to determine appropriate restrictions.

On July 11, 2008, Coleman emailed Gliori, stating that, after consulting with another supervisor in a similar machine shop, Coleman determined that Plaintiff's restrictions would "significantly impact [his] ability to operate" at least three pieces of equipment in the PDS. (Def. Ex. 9, Disability Medical Notes at WC214-15). In the email, Coleman described the three pieces of equipment as follows:

---

4 It appears that Plaintiff himself told Erickson that his job did not require overhead lifting. Plaintiff contests this, asserting that he does not remember what he told Erickson about the requirements of his job and "does not know what 'overhead activities' are." (Pl. RSOF ¶ 35).

BENDING BRAKES, particularly AMADA. This is high impact. When forming larger parts, both arms are used over the shoulder to hold and remove the part during and after the forming operation. These parts are typically heavy, over the 5lb limit. The shop is often called upon to fabricate multiple parts, most with more than one bend per part. Both the repetitive motion and weight factors are issues.

DRILL PRESS. Also high impact. Repetitive motion is used for drilling holes, tapping holes and countersinking holes. We have two DRILL PRESS machines in the Naperville shop. Both RIGHT handed operations. Operation requires RIGHT arm at, or above, shoulder level to pull down on the handle (leyer). Pulling force required depends on operation performed. The left hand is simultaneously used to hold and position the work. Neither of the machines we own can be easily modified for LEFT handed operation.

ARBOR PRESS. Lower impact. Similar usage as the drill press. Ma[chine] is used for pressing one part into another, e.g. a dowel pin into a hole. Not as frequently used as drill press. Possible alternate work around may be available. (Def. Ex. 9 at WC214).

Later on July 11, 2008, Gliori responded to Coleman via email, stating that she would have Dr. Pearah review his descriptions of the machines and then Dr. Pearah would determine whether or not he needed to inspect the machines. Coleman responded that he would make one of Plaintiff's coworkers available to demonstrate the operation of the equipment if Dr. Pearah wanted to see it. Coleman also stated he was concerned that Plaintiff might "not always obey the work restriction," or would "try [to] do more [than] he should," thereby risking "further injury." (Def. Ex. 9, Disability Medical Notes at WC215).

On July 16, 2008, Gliori met with Dr. Pearah to discuss Plaintiff's restrictions, the FCE results, and Coleman's description of the three machines. Dr. Pearah determined that operating each of the machines would violate the restrictions he had placed on Plaintiff. Dr. Pearah declined to examine the machines personally because he felt he had sufficient information to make a determination. Later that day, Gliori called Plaintiff and informed him of Dr. Pearah's determination. Plaintiff stated his disagreement with the restrictions and belief that he could return to work without any problem.

7

On July 21, 2008, Coleman advised Gliori via email that if Plaintiff's restrictions prohibited him from operating the three machines in question, Coleman did not believe ALU could accommodate him. On July 30, 2008, Gliori called Erickson and asked him to reconsider Plaintiff's capabilities in light of Coleman's descriptions of the three machines in question, and also to provide an opinion as to whether further testing would be helpful to determine Plaintiff's overhead motion capabilities.

On August 1, 2008, Erickson provided an amended FCE report to Gliori. The report stated, in part:

> During this evaluation, [Plaintiff] safely demonstrated physical physical capabilities to perform the drill press or arbor press (as described in formal job description), demonstrating a pull down force from overhead with his right arm up to 80 pounds. With overhead lifting activities, Mr. Coldwate demonstrated the ability to lift 5 pounds with his right arm or 15 pounds with left arm, with one arm activities; while using both arms, Mr. Coldwate may lift up to 15-20 pounds.
> (Pl. Ex. 21).

However, Gliori found certain parts of the amended FCE report to be contradictory, and it also did not address her question about whether Plaintiff's ability to perform repetitive overhead motions could be specifically tested. For these reasons, on August 7, 2008, Gliori faxed Erickson a letter asking for further clarification on recommended restrictions and whether further testing could be done regarding repetitive overhead motions. Erickson responded the same day, via fax, that no further testing could be done.

On August 20, 2008, Gliori organized a conference call with herself, Bergland, Dr. Pearah, Coleman, and Coleman's supervisor, Linda De Stasio, to discuss Plaintiff's restrictions and whether they could be accommodated. During the call, Coleman expressed concern that Plaintiff was one of only two employees trained to use the Amada bending brake machine, and

8

that from week to week use of the machine could comprise anywhere from 10% to 80% of Plaintiff's job. Coleman also raised the possibility of having to outsource jobs if work came in that Plaintiff could not do on his own.

The next day, August 21, 2008, another conference call was held between Gliori, Bergland, Coleman, De Stasio, and Claudia Stickney, a job-accommodation and equal opportunity specialist for ALU. The parties discussed potential accommodations for Plaintiff and Coleman agreed to see if Robert Harringer, ALU's Environmental Health & Safety Manager, could perform a more detailed assessment of Plaintiff's job functions. On September 8, 2008, Harringer conducted this assessment by observing two of Plaintiff's coworkers demonstrate the use of the three machines at issue. The two co-workers had input into Harringer's eventual report, the relevant findings of which are as follows:

   a. The Amada bending brake requires frequently selecting punches and dies that weigh 20-50 pounds from racks ranging from floor level to seven feet off the ground. (Ex. 28 at D24);

   b. Some of the parts the Amada machine is used to bend weigh at least five pounds, and some operations require the employee to raise both hands above shoulder level to secure the part (*id.*);

   c. The Amada machine could not be used in a way that avoids over-shoulder moves unless the employee used a footstool, which Harringer did not consider to be safe (*id.*);

   d. Operation of the drill press requires an overhead reach, which cannot be avoided except by use of a footstool, a practice Harringer did not consider to be safe (*id.* at D25);

   e. Operation of the arbor press requires an overhead reach, which cannot be avoided except by use of a footstool, a practice Harringer did not consider to be safe (*id.*);

   f. Numerous gauges, fixtures and tools are stored on cabinet tops requiring above-the-shoulder motion to reach. Harringer did not believe there was any practical way to relocate those devices to a lower surface (*id*. at D26)

g. Almost every piece of equipment in the PDS shop requires the operator to lift their arms above shoulder-height with a frequency varying from once or twice per day to many times an hour. (*id.*)

h. Plaintiff spent about 50 percent of his time on the job operating the Amada bending brake, and about 5 percent of his time operating the drill press. The arbor press was "rarely used – but used, nonetheless." *Id*. at D24-25.

On September 11, 2008, Gliori, Coleman, De Stasio, Harringer, Stickney and Lorings, another ALU job-accommodation and equal opportunity specialists, and other ALU representatives held a final conference call to discuss Harringer's report and potential accommodations. Coleman stated his belief that, based on Harringer's report, Plaintiff's restrictions could not be accommodated. The parties discussed possible last ditch solutions, such as the use of ladders, stools or platforms to avoid overhead reaching. In Harringer's opinion, these options created unacceptable safety risks.

During the call, Stickney stated that she would run Plaintiff's case by a third-party consultant that gives employers advice regarding reasonable accommodations. The call participants agreed that ALU would wait for Stickney to report back on this, but barring any change in circumstances, Plaintiff's restrictions could not be accommodated and his employment would be terminated. On September 19, 2008, Lorings reported back to Gliori that the representative from the third-party consultant "felt [ALU] had exhausted all remedies to accommodate [Plaintiff's] restrictions; he was unable to provide additional suggestions." (Def. Es. 9 at WC220).

On September 23, 2008, Peggy Blumer, ALU's Authorized Benefit Delegate, sent Plaintiff a letter stating that since he could not return to work by the time his short-term

disability benefits expired on October 4, 2008, his employment would be terminated on that date. On October 8, 2008, Defendant terminated Plaintiff's employment.

Sometime after his October 4, 2008 termination, Plaintiff filled out and submitted to the Social Security Administration an application for disability and benefits. In the application, Plaintiff indicated that his condition became severe enough to prevent him from working as of October 4, 2011. Plaintiff later withdrew the application. At his deposition, he testified that he did not personally believe he was disabled but filed the form because "Lucent said I was disabled," and he "thought that maybe [he] could get some money . . . that." (Def. Ex. 2 at 117:9-118:3.). He also testified that he later withdrew his application because after submitting it, he "thought about it" and decided "that's not the right thing to do." (Def. Ex. 2 at 115:23-25).

## IX. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Once the moving party has met this burden, the non-moving party must go beyond the pleadings and sent forth specific facts showing there is a genuine issue for trial. *Celotex Copr. V. Catrett*, 477 U.S. 317, 324 (1986). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Hanson v. Caterpillar*, 688 F.3d 816, 818 (7th Cir. 2012).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Stewart v. McGinnis,* 5 F.3d 1031, 1033 (7th Cir. 1993). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."

11

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

## X. DISCUSSION

Plaintiff argues that his termination constituted unlawful discrimination under the IHRA and the ADA because it was based on (1) Defendant's perception that Plaintiff was disabled, and (2) Plaintiff's medical history. Alternatively, he argues that Defendant violated his rights under ERISA because it terminated him in order to avoid providing him full benefits under (1) its severance plan, which Plaintiff would have otherwise been entitled to as an active employee subject to layoff; and (2) its pension plan, which Plaintiff would have received the full benefits of if he had worked until the age of 65. I examine each claim in turn.

### A. The ADA Claim5

The ADA prohibits discrimination against a "qualified individual with a disability." 42 U.S.C. § 12112(a). 6 The Act defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id*. § 12102 (2) (as amended § 12102(1)). In this case, Plaintiff alleges only that Defendant regarded him as having a physical impairment that limits his major life activity of working.

---

5 Defendant argues that Plaintiff is estopped from even raising an ADA claim because the factual representations he made in his application for Social Security benefits contradict the factual underpinnings of his claim. *See Opsteen v. Keller Structures, Inc.*, 408 F.3d 390, 392 (7th Cir. 2005). The argument is reasonable but I think it leads to too harsh a result in this case. Plaintiff's case is distinguishable from *Opsteen*. Most importantly, Plaintiff withdrew his application before receiving any benefits so the equitable principles behind estoppel are not as strong here.

6 The ADA was amended effective January 1, 2009. Defendant's alleged violations took place before this date, so the pre-amendment version of the ADA governs here. *See Fredricksen v. UPS, Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009).

To meet the "regarded as" prong, Plaintiff must offer evidence that Defendant believed, rightly or wrongly, that his impairment substantially limited his ability to work. 29 C.F.R. § 1630.2(l); *Hanson*, 688 F.3d at 819. To do this, Plaintiff must point to evidence that shows Defendant "regarded him as limited in his ability to perform not merely one particular job but a class or broad range of jobs." *Miller v. Dep't of Transp.*, 643 F.3d 190, 195 (7th Cir. 2011); *see also Kupstas v. City of Greenwood*, 398 F.3d 609, 613 (7th Cir. 2005) ("The impairments must substantially limit employment generally, not merely preclude an employee from performing either a particular specialized job or a narrow range of jobs." (quotation marks and citation omitted)). Here, it is undisputed that Defendant subjectively believed Plaintiff had limited use of his right shoulder—specifically, that he could not (1) lift more than 5 pounds over shoulder level with his right arm, and (2) perform work over shoulder level requiring repetitive motion with his right arm. Thus, the threshold issue for the ADA "regarded as" claim is whether Defendant perceived these limitations as preventing Plaintiff from performing a broad range of jobs. *See Hanson*, 688 F.3d at 819.

Plaintiff attempts to avoid summary judgment on this issue by arguing that Dr. Pearah's restrictions were so severe that a reasonable jury could "at least infer that [in Defendant's view] Plaintiff was disqualified from working any job regardless of industry, in which he would need to raise his arm over his shoulder more than once a day." (Pl.'s Resp. at 4). There are several problems with this argument. First, it vastly overstates Plaintiff's actual restrictions. Under Dr. Pearah's restrictions, Plaintiff could lift his right arm above his shoulder as many times as he needed in a day, so long as he was not lifting more than 5 pounds or performing work that required repetitive motion. There is no evidence in the record to suggest that Defendant

13

interpreted Dr. Pearah's restrictions to mean that Plaintiff could not lift his right arm above shoulder level more than once a day, and no reasonable jury could find otherwise.

Second, Plaintiff can point to no evidence to controvert all of the facts in the record indicating Defendant *did not* believe Plaintiff was unable to perform a broad range of jobs. From May 30, 2006, when Plaintiff returned to work following the car accident, to December 25, 2007, when Plaintiff took his final leave of absence, Defendant accommodated Plaintiff by assigning him numerous light-duty tasks that did not aggravate his injury. This is strong evidence that Defendant believed Plaintiff's injury only restricted him from working a narrow, not broad, range of jobs. *See Hanson*, 688 F.3d at 820. Plaintiff's theory that Coleman construed Dr. Pearah's restrictions "as broadly as possible" in an effort to portray Plaintiff as being more limited than he really was is simply not borne out by the record.

Finally, the record reflects that the ultimate decision to terminate Plaintiff was based on his inability to safely operate the Amada bending brake, drill press, and arbor press machines that are a requirement of his job as a metal fabricating mechanic. The job function assessment conducted by Harringer, which I regard as the primary basis for Plaintiff's termination, does not consider anything beyond the requirements of this narrow class of jobs. There is simply no evidence in the record to show that Defendant considered him unable to perform a broader set of jobs that did not require use of these machines, and Plaintiff himself admits that prior to his termination in 2008, Coleman never considered Plaintiff's fitness for other jobs at ALU. (Pl's RSOF ¶ 71). Coleman's speculation at his deposition about Plaintiff's ability to perform other jobs is not probative of ALU's subjective beliefs at the time of Plaintiff's termination. *See Hanson*, 688 F.3d at 820.

Plaintiff argues that summary judgment must be denied because "whether or not Plaintiff could perform the essential functions of his job is contested." (Pl. Resp. at 11). That issue very well may be contested, but it is also irrelevant. Even if Defendant was wrong in believing that Plaintiff could not operate the necessary machinery for his position, Plaintiff cannot prevail because the belief extended only to a narrow set of functions. The ADA "regarded as" prong concerns the scope of employer perceptions regarding their employee's functional capabilities, not accuracy.

For these reasons, Plaintiff cannot show there is a genuine factual dispute over whether Defendant regarded him as unable to perform a broad range of jobs. At the summary judgment stage, it is not enough to baldly "contest" facts—Plaintiff must point to the materials in the record for support. Fed. R. Civ. P. 56(c). He has not adequately done so. Defendant's motion for summary judgment on the ADA claims is granted.

### B. The IHRA Claims

Plaintiff's IHRA claims fail for similar reasons. The IHRA defines "disability" as a "determinable physical or mental characteristic of a person . . . which may result from disease, injury, congenital condition of birth, or functional disorder." 775 ILCS § 5/1-101(1). The definition requires that the "characteristic" in question be "unrelated to the person's ability to perform the duties of a particular job or position." 775 ILCS § 5/1-101(I)(1). There can be no question that Plaintiff's shoulder restrictions fail to satisfy the "unrelated" condition since, as explained above, the restrictions relate *entirely* to his ability to perform his duties. Plaintiff himself admits that his May 2006 shoulder injury and subsequent surgery reduced his overhead lifting capabilities (Pl.'s RSOF ¶ 12) and can point to no competent evidence to controvert facts

in the record showing his job requires significant overhead lifting. Oddly, Plaintiff tries to get around the fact that his condition does not satisfy the IHRA's definition of disability by shifting the focus to Defendant's motivation for firing him. (Pl's Resp. at 6). But in determining whether Plaintiff's perceived limitations meet the statutory definition of a disability, Defendant's subjective motivation for firing him is not relevant. Plaintiff's inability to satisfy the statutory definition of "disability" defeats both his "perceived as" and "history of" claims under the IHRA. Defendant's motion for summary judgment on the IHRA claims is granted.

      C.      <u>The ERISA Claims</u>

Section 510 of ERISA provides in part: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. Plaintiff claims that ALU violated ERISA § 510 by terminating him for the purpose of interfering with severance and pension benefits that he otherwise would have received. To survive summary judgment, Plaintiff must point to evidence that Defendant specifically intended to deprive Plaintiff of his benefit rights; showing only that loss of benefits was a consequence of termination is not enough. *Isbel v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir. 2005).

Lacking any direct evidence of Defendant's intent to deprive Plaintiff of benefits, Plaintiff attempts to make out a prima facie case under the indirect method with the familiar *McDonnell Douglas* burden-shifting analysis. To do this, Plaintiff must show that "1) [he] is a member of an ERISA plan, 2) [he] was qualified for the position, and 3) [he] was discharged under circumstances that provide some basis for believing that [ALU] intended to deprive [him]

16

of benefits." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 943 (7th Cir. 2007). The parties do not dispute that Plaintiff has met the first two prongs; the question is whether there is any basis for believing ALU intended to deprive him of benefits.

The answer is no. There is absolutely no evidence in the record of ALU's intent to deprive Plaintiff of benefits. To the contrary, between June and September 2008, ALU personnel went to great lengths to find a way to get Plaintiff back on the job where he would remain eligible for full benefits. For example, at least three conference calls were held in August and September 2008 between Gliori, Coleman, ALU's equal opportunity and accommodation specialists and others, to discuss potential accommodations for Plaintiff, which Plaintiff himself admits was unusual. (Pl's RSOF ¶ 55). Additionally, to confirm that Coleman's estimation of Plaintiff's typical use of the three machines was not overstated, ALU had Harringer complete a thorough assessment of Plaintiff's job functions, and consider possible alternative ways of operating the machines. Finally, just to be sure they had exhausted all possible accommodation possibilities, Defendant referred Plaintiff's case to an independent consultant who confirmed Defendant's position. This is hardly the behavior of an organization attempting to wrongfully push someone out.

Plaintiff puts forth three arguments to try to demonstrate a fact dispute. First he points to the general fact that Coleman had budget responsibilities and, based on that alone, a "jury could easily conclude that Coleman wanted to get Plaintiff off his department's books and earn brownie points with his management" for saving money. This argument fails. If pointing out that a defendant stood to save money by eliminating an employee was all it took to show intent,

17

the third prong of the indirect test would be rendered a nullity. Plaintiff has to point to more probative facts.

Second, Plaintiff argues that when ALU anticipated it was going to lay him off, it did not offer a sweetened severance package to him as it has done in the past with other union employees. In support of this, Plaintiff points to a severance package that Defendant offered to several employees between June 2006 and August 2007 when it consolidated its Whippany and Murray Hill electrical shops. According to Coleman, additional compensation was offered to employees who would be losing their jobs as a result of the consolidation in order "to avoid involuntary layoffs." (Pl. Ex. 1 at 18-19). What relevance this has to Plaintiff's unrelated August 2008 termination is never adequately explained. However, I am satisfied that whatever potential evidentiary weight it may carry is not enough to create a genuine issue of disputed fact in the face of the substantial countervailing evidence that Defendant did everything possible to keep Plaintiff within its employ.

Finally, Plaintiff makes an extremely vague and undeveloped argument that his layoff was part of some larger plan of Defendant's to accomplish certain unspecified "reduction goals." Again, the evidence Plaintiff points to in support is simply not probative of intent to deny benefits. Defendant's motion for summary judgment on the ERISA claims is granted.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment on all counts is GRANTED.

18

ENTER:

*James B. Zagel*
James B. Zagel
United States District Judge

DATE: October 18, 2012