# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

WILLIAM G. COLDWATE

    Plaintiff,

    v.

ALCATEL-LUCENT USA, INC.
    Defendant.

No. 10 CV 4918
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Both parties have filed motions to reconsider my January 25, 2013 Opinion and Order granting in part Plaintiff's motion to reconsider. My ruling was based on an erroneous assumption regarding Plaintiff's theory of discrimination, which was never clearly stated in his briefing papers. *See Timmons v. General Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006) ("It is important for plaintiffs to be clear about whether they are pressing disparate treatment or failure-to-accommodate claims (or both) because the two are analyzed differently."). Consequently, I strike and withdraw my January 25 Opinion and Order in its entirety, deny the pending motions to reconsider as moot, and consider anew Plaintiff's initial Rule 52(b) motion.

Plaintiff raises two grounds for reconsideration of my October 18, 2012 order granting summary judgment to Defendant.[1] First, he argues that I overlooked his claim that he had a "disability" within the meaning of the ADA because he had a record of a physical or mental impairment that substantially limits one or more of his major life activities. 42 U.S.C. § 12102(1)(B). Second, he argues that I failed to recognize the distinction between a "class of jobs" and a "broad range of jobs" as defined under the 2008 Code of Federal Regulations, and that this led to an erroneous finding that Plaintiff was not "regarded as" being disabled by

---

[1] I incorporate by reference herein the factual background from my October 18, 2012 Opinion and Order.

Defendant. 29 C.F.R. 1630.2(j)(3)(ii)(B) and (C) (2008).

Rather than address these arguments, I turn to Defendant's alternative ground for summary judgment: that Plaintiff cannot show he was terminated "because of" disability. 42 U.S.C. § 12112. If Defendant is correct, I need not consider the arguments in Plaintiff's motion for reconsideration. For purposes of this motion, I will assume that Plaintiff has raised a genuine issue of material fact as to whether he is a "qualified individual with a disability." Because I find that Plaintiff cannot show that his termination was based on prohibited animus, Plaintiff's motion to reconsider is DENIED and my October 18, 2010 Opinion and Order is AMENDED to include this order.

1. ANALYSIS

To make a prima facie showing of disability discrimination under the ADA, Plaintiff must demonstrate that he is (1) disabled within the meaning of the ADA, (2) qualified to perform the essential functions of the job either with or without accommodation and (3) he suffered an adverse employment action because of his disability. *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000).

Once an ADA plaintiff has established that he is a qualified individual with a disability, he may show discrimination in either of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate. *Hoffman v. Caterpillar, Inc*., 256 F.3d 568, 572 (7th Cir. 2001). Plaintiff has elected to proceed under a disparate treatment theory, which can be proven using the direct or indirect (i.e. *McDonnell Douglas* burden-shifting) method of proof. *Id*. Plaintiff has made clear that he wishes to proceed under the direct method of proof, (Pl. Resp. at 2), which he may do by presenting direct or circumstantial evidence of discrimination. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012).

Direct evidence of discrimination "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). There is no such evidence in this case. Thus, Plaintiff must demonstrate a "convincing mosaic of circumstantial evidence that would permit the same inference without the employer's admission." *Coleman*, 667 F.3d at 860.

There are three types of circumstantial evidence available to a plaintiff using the "convincing mosaic" approach. The first includes "suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [discriminatory] intent might be drawn." *Coleman*, 667 F.3d at 860 (internal quotations and citations omitted). The second involves "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." *Id*. The third type is "evidence that the employer offered a pretextual reason for an adverse employment action." *Id*. "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).

Plaintiff's theory of the case is that Coleman held a prohibited animus toward him based on a mistaken perception that Plaintiff was disabled and Plaintiff's record of past disabilities, and that Coleman "manipulated Health Services in order to gain support for his position [i.e. that Plaintiff should be terminated]." (Pl. Resp. at 1). He attempts to prove this theory using evidence of purportedly ambiguous oral and written statements by Coleman, as well as actions taken by Coleman and Health Services personnel, namely Gliori and Dr. Pearah, that Plaintiff believes were pretextual.

Plaintiff points to the following events as evidence that Coleman took action against him based on discriminatory bias: **1)** in late 2007, Coleman expressed concern/frustration about Plaintiff's absences and conducted a review of his 2007 attendance record (Pl. SOAF ¶ 9-10); **2)** in late 2007, Coleman expressed doubt about Plaintiff's ability to ever "come back to the shop and do his job" because his "health was so poor" (Pl. SOAF ¶ 8, 11); **3)** in November 2007, Coleman requested that Plaintiff undergo a Fitness For Duty Examination ("FFDE") because he was "concerned about the budgetary strain that [Plaintiff] has caused the dept for the last 2 yrs." (Pl. SOAF ¶ 11); **4)** on June 4 2008, Coleman requested that Plaintiff undergo a Functional Capacity Examination ("FCE") before returning to work (Def. SOF ¶ 18), and asked "for reassurance that [Plaintiff would] be able to sustain attendance at work with no restrictions" (Def. SOF ¶ 22); and **5)** on July 11, 2008, Coleman sent an email to Gliori in which he described the operation of the Amada bending brake, the drill press and the arbor press machines, and told Gliori that he believed that Dr. Pearah's restrictions would "significantly impact [Plaintiff's] ability to operate" these three pieces of equipment. (Def. SOF ¶ 42).

This evidence falls short of a "convincing mosaic" of circumstantial proof that Coleman acted based on a prohibited animus. It demonstrates nothing more than Coleman's legitimate concern that, based on Plaintiff's actual characteristics and the restrictions set in place by Dr. Pearah, Plaintiff would be unable to perform the essential functions of his job. *Hoffman*, 256 F.3d at 574 ("[T]he ADA discourages employment decisions based on strereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics." (internal citation omitted)).

For example, Coleman's concern in November 2007 about Plaintiff's absences is not evidence of discriminatory intent; it goes to his belief that Plaintiff was not a "qualified

individual." *See Nowak v. St. Rita High School*, 142 F.3d 999, 1004 (7th Cir. 1998) ("The ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence.") Similarly, the fact that Coleman requested that Plaintiff undergo an FCE and asked Gliori for reassurance that Plaintiff would "be able to sustain attendance at work with no restrictions" does not evidence bias. Coleman testified that what was important to him was that Plaintiff "could return to work and fulfill his job functions in the shop" and "actually work in his job classification," as opposed to returning to temporary light-duty work. (Pl.'s RSOF ¶ 22). Plaintiff insists that Coleman's explanations are pretextual but presents no evidence to support this inference, such as inconsistent statements[2], double standards, or misstatements regarding the essential functions of the job. Without such evidence, Plaintiff's argument amounts to no more than speculation.

Finally, Coleman's July 11, 2008 email is not evidence of discriminatory intent. Plaintiff agrees that operation of the three machines is an essential function of his job, and he agrees with Coleman's description of how the drill and arbor presses are operated. (Coldwate Dep. at 60:2-6; 41:6-17). Although Plaintiff disagrees with Coleman's description of the Amada bending brake machine, he admits that he has no reason to believe Coleman intentionally misrepresented anything in his description. (Id. at 41:18-42:13). Nevertheless, Plaintiff argues that Coleman "sent the email to prevent Plaintiff from returning from his job." (Pl. RSOF ¶ 43(5)). That may be, but Plaintiff has not shown that Coleman was motivated by anything other than an honestly held belief that Plaintiff could not do his job.

Even if Plaintiff could show prohibited animus on Coleman's part, he has a causation problem. There were too many intervening factors between Coleman's actions and Plaintiff's

---

[2] Not only does Plaintiff lack evidence of ambiguous or conflicting statements made by Coleman, he acknowledges Coleman made statements that directly undermine any inference of discriminatory intent. *See* Def.'s RSOAF ¶ 7.

termination for a reasonable jury to find "but for" causation. *See Serwatka v. Rockwell Automation*, 591 F.3d 957, 962 (7th Cir. 2010). These factors include: 1) separate individuals involved in the decision-making process for whom there is no evidence of discriminatory animus; 2) discrete events outside of Coleman's control that formed the basis for Plaintiff's termination (namely, the FCE examination, Dr. Pearah's restrictions, and the Harringer Report). While Plaintiff claims that Coleman was the "ultimate decision maker" behind his termination, this is not borne out by the evidence.

It is true that Coleman requested that Plaintiff undergo an FCE, but it is also undisputed that the ultimate decision to order the FCE was made by Gliori, Bergland and Dr. Pearah (Pl. Resp. to Def. SOF ¶ 32). Plaintiff claims that Coleman somehow manipulated them into making the decision but there is no support for this in the record. Regardless of who ordered the FCE, Plaintiff admits that he has no reason to doubt that Erickson honestly believed the restrictions he recommended were appropriate. (Pl. Resp. to Def. SOF ¶ 34). So even if there was evidence of a grand conspiracy among Coleman, Gliori, Bergland, and Dr. Pearah to order an FCE based on discriminatory animus, the causal chain is broken by the fact that Erickson was not part of the conspiracy and neither Coleman nor anyone else at ALU controlled the FCE results.

Similarly, even if Coleman's July 11, 2008 email to Gliori, in which he stated his belief that Plaintiff's restrictions would "significantly impact" his ability to operate certain machinery, was based on a discriminatory animus rather than an honest belief, it was superseded by the Harringer Report. The Harringer Report was a detailed, neutral assessment of the essential functions of the MFM position that: 1) confirmed Coleman's description of how the Amada bending brake, drill press, and arbor press machines are operated; and 2) formed the ultimate basis for Plaintiff's termination. Plaintiff does not dispute any of the information in the

Harringer Report, nor does he have any reason to believe it was infected by discriminatory animus. (Pl. Resp. to Def. SOF ¶¶ 59, 61). Collectively, the FCE and the Harringer Report render Coleman's actual motivations largely irrelevant.

Plaintiff also points to certain decisions made by Gliori and Dr. Pearah as evidence of discriminatory intent. He first argues that their decision to order the FCE was suspicious because it came after Dr. Watt and Dr. McGivney had cleared Plaintiff to return to work with no restrictions. But no reasonable jury could view Gliori's refusal to rely on these clearances as evidence of discriminatory intent. Defendant was primarily concerned with Plaintiff's right shoulder capacity, not his back, so Dr. McGivney's note was of little help. And while it is true that Plaintiff's shoulder surgeon, Dr. Watt, cleared Plaintiff to return to work with no restrictions, Gliori had good reason for skepticism.

Dr. Watt's May 6, 2008 note came less than three months after a February 22, 2008 note in which he stated that Plaintiff "had been showing gradual, but slow progress," and indicated the "prognosis is somewhat guarded because of the nature of the massive tear, which was repaired." Further, the note consisted of a checked box; it contained no explanation of how the prognosis had suddenly changed, or whether Dr. Watt had considered the specific demands of Plaintiff's job. Gliori was entitled to seek a second opinion under these circumstances, and the fact that she sought that opinion from an independent third-party (Erickson) destroys any inference of pretext. There is simply no reason to believe that Gliori's proffered non-discriminatory reasons for ordering the FCE—Plaintiff's history of multiple injuries, her concern about his ability to safely do the job, and the "red flag" of what she perceived to be over-eagerness to return to work (Pl. RSOF ¶ 24)—were pretextual.

7

Plaintiff argues that Gliori also ignored Erickson's recommendation in the first FCE that Plaintiff could "return to work full duty." (Def. Ex. 21, FCE Report 7-1-08 at D29). However, Erickson's recommendation was clearly based on an erroneous belief that Plaintiff's job did not require overhead lifting, which Plaintiff himself admits is not true. (Coldwate Dep. at 212:19-24). So, once again, there is nothing suspicious about the fact that Gliori sought further clarification from Erickson on this point. Once Erickson better understood the demands of Plaintiff's job, he adjusted his recommendations by finding that Plaintiff demonstrated physical abilities to operate the drill press or arbor press but was limited with overhead lifting to no more than 15-20 pounds using both arms. (Def. Ex. 25, Amended FCE Report 8-1-08 at D41).

Plaintiff next argues discriminatory intent can be inferred from the restrictions that Dr. Pearah placed on him. Dr. Pearah placed two permanent restrictions on Plaintiff after receiving the results of the first FCE: 1) no lifting of more than 5 pounds over the shoulder with his right arm, and 2) no work requiring repetitive over-the-shoulder movements with his right arm. (Def. Ex. 9, Disability Medical Notes at WC212; Pearah Dep. 89:14-17; Def. SOF ¶ 36). The first restriction arose directly from the FCE recommendation. The second restriction Dr. Pearah added based on his own medical judgment and Plaintiff's history of repeated injury to his right shoulder. (Def. Ex. 18, Pearah Dep. at 79:5-84:23).

Plaintiff argues that Dr. Pearah's consideration of his medical history is evidence of discrimination based on a "record of" disability. That is incorrect. Plaintiff is mixing up a medical determination with an employment action. Plaintiff's medical history did not form the basis for his termination. Rather, it was one piece of information that Dr. Pearah considered in designing physical restrictions that he believed were necessary for Plaintiff's safety. Ultimately, it was determined that Plaintiff could not perform the specific functions of the MFM position

8

under these restrictions. But that goes to Defendant's belief that Plaintiff was not a "qualified individual"; it does not demonstrate prohibited bias.

Plaintiff also suggests that Dr. Pearah's restrictions were so out of proportion to Plaintiff's actual physical limitations that they could not have been imposed solely for his own safety. I disagree for several reasons. First, the no-repetitive-over-shoulder-work restriction bears an obvious and direct relation to Plaintiff's history of right rotator cuff injury and the overhead lifting restrictions recommended by Erickson. Given this objective grounding, there is no basis to infer Dr. Pearah was purposefully concocting gratuitous restrictions in an effort to set Plaintiff up for failure. Second, the evidence shows that Gliori discussed Dr. Pearah's restrictions with Erickson and he agreed that *both* were appropriate. (Def. Ex. 9, Disability Medical Notes at WC218). Third, Gliori repeatedly asked Erickson if he could further test Plaintiff's ability to perform repetitive overhead motion to confirm that the restriction was necessary. (Pl. RSOF ¶ 52). For some reason Erickson was unable to oblige, but Gliori's repeat solicitations for third-party testing severely undercuts any inference that she and Dr. Pearah conspired to impose excessive restrictions.

The larger point here is that even if Plaintiff could raise a factual dispute over whether Dr. Pearah's restrictions were appropriate, he cannot show that Dr. Pearah did not honestly believe them to be so. To the extent Plaintiff suggests Coleman manipulated Dr. Pearah into imposing the restrictions, it is complete speculation that finds no support in the record. Otherwise, Plaintiff has demonstrated nothing more than the possibility that Dr. Pearah conducted an inadequate investigation before imposing the restrictions. Absent more probative evidence of pretext—i.e. inconsistent statements, a departure from normal policies, use of a double standard—this shows negligence at most, which does not suffice. *See Yindee v. CCH*

*Inc.*, 458 F.3d 599, 602 (7th Cir. 2006) (It is not enough to demonstrate that the employer was mistaken, inconsiderate, short-fused or otherwise benighted; none of these possibilities violates federal law.").

Ultimately, this case boils down to Plaintiff's disagreement with 1) Erickson's assessment of Plaintiff's right-shoulder capabilities; and 2) Dr. Pearah's determination of the appropriate physical restrictions to impose in light of Erickson's assessment and Plaintiff's history of right shoulder injury. The problem for Plaintiff is that he has failed to put forth a convincing mosaic of circumstantial evidence from which a reasonable jury could infer that either assessment was based on discriminatory animus. His case consists of speculation and illusory fact disputes, and it is directly undermined by his own inconsistent, or plainly incredible, statements, *e.g.*: "Plaintiff does not believe his job requires overhead lifting, although he admits he may have to lift a die overhead to place it in a storage rack" (Pl.'s Resp. at 9); "Plaintiff does not know what 'overhead activities' are" (Pl. RSOF ¶ 35(2); Pl.'s RSOF ¶ 68(2).

There is no genuine issue of material fact as to whether Plaintiff was terminated "because of" a record of disability or because Defendant regarded him as disabled. 42 U.S.C. § 12112. Defendant engaged in an exhaustive, three-month-long process to determine if there was any way that Plaintiff could perform his job following his 2007 surgery to repair his right rotator cuff. This process included a physical examination from an independent third-party, multiple conference calls between various employees to discuss possible accommodations (which Plaintiff himself admits was unusual (Pl.'s RSOF ¶ 55)), a special assessment of the core job functions of the MFM position, and a final consultation with a third-party group to determine whether any other accommodations should be considered (Pl's RSOF ¶¶ 63-64).

At the end of this process, the evidence suggests that a collective determination was made between Gliori, Coleman, De Stasio, Harringer, Stickney, Lorings and other ALU personnel that, based on the physical restrictions imposed by Dr. Pearah and the requirements of the MFM position as detailed in the Harringer Report, Plaintiff's restrictions could not be accommodated. (Pl's RSOF ¶¶ 62-64). This determination may have been mistaken, but without *some* evidence that it was motivated by discriminatory intent this case cannot proceed to a jury. *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 626 (7th Cir. 2001) ("Even if the [defendant] was incorrect in its belief, we will not contest the [defendant's] reasoning if [it] acted in good faith and held an honest belief in the proffered reason for [the plaintiff's] termination.").

II. CONCLUSION

For the foregoing reasons, my October 18, 2012 Opinion and Order is AMENDED to include this opinion, my January 25, 2013 Opinion and Order is WITHDRAWN, Plaintiff's original motion for reconsideration [115] is GRANTED in part and DENIED in part, and both Plaintiff and Defendant's pending motions to reconsider ([125] and [128]) are DENIED as moot. Defendant's motion for summary judgment [87] is GRANTED on the grounds that Plaintiff has failed to raise a genuine issue of material fact over whether he was fired "because of" his perceived disability. 42 U.S.C. § 12112 (2008).

ENTER:

*[signature: James B. Zagel]*

James B. Zagel
United States District Judge

DATE: March 25, 2013

11